# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAUL KIRCHER, III,                    :        No. 4:13-cv-02143
                                              :
      Plaintiff,                  :        (Judge Brann)
                                              :
    v.                               :
                                              :
PENNSYLVANIA STATE POLICE              :
DEPARTMENT, and TROOPER                :
ERIC FARABAUGH and TROOPER             :
DENNIS MILLER, in their official       :
and individual capacities,             :
                                              :
      Defendants.                 :

## MEMORANDUM

### August 17, 2016

Far too often we are reminded that for law enforcement officers, a moment's hesitation can mean the difference between life and death. Precisely for that reason, the law affords a certain deference to police officers who employ reasonable means to effect the arrest of dangerous or resisting subjects. That deference does not excuse excessively violent or improperly motivated police conduct, but neither does it require officers to wholly avoid physical contact with uncooperative individuals. Rather, our precedents establish that when the

wellbeing of an officer or the community has been put at stake, the after-acquired benefits of hindsight must yield to an objective sense of reasonableness whose bounds are set by the officer's observations in that particular moment.

The battle between hindsight and perception has waged itself in this case perhaps more vigorously and more poignantly than in most others. The rather unfortunate reality presently before the Court is one in which two Pennsylvania State Police officers deployed their tasers approximately seventeen times in an effort to subdue a man who was driving on a rural Cameron County road at night without his headlights activated. The subject then led the police on a low-speed pursuit wherein he frequently veered across lanes, attempted to block the officers' patrol car, freed his vehicle, and changed directions several times after police had pinned his car. When officers approached his vehicle for the final time that night, he refused to exit his car but chose instead to keep revving the engine.

As the facts would later unravel over the course of discovery, it became evident that the driver was not under the influence of a prohibited substance, casing a neighborhood home to burglarize, or a wanted fugitive fleeing police. He was an individual who had previously been diagnosed as a paranoid schizophrenic and who suffered from severe paranoia issues. He was an

exceptionally stressed individual who set out by car from New Jersey approximately two days prior to the incident in an unprepared and ill-fated attempt to drive cross-country to California so that he might, in his own words, "hit the reset button" on life. Of course, in the moments during which they made the decisions to deploy their tasers, the officers possessed a mere fraction of the background information that this Court and the parties now enjoy.

Thereafter, that man, Paul Kircher, III, filed a federal civil rights lawsuit against the officers who arrested him, as well as the Pennsylvania State Police. The matter was assigned to United States Magistrate Judge William I. Arbuckle, III, who recommended that Defendants' motion for summary judgment be granted in part and denied in part. I now adopt in part and reject in part Judge Arbuckle's report and recommendation. I will adopt those sections of analysis that granted summary judgment in favor of Defendants. However, I will also reject those sections of Judge Arbuckle's analysis that denied summary judgment as to the remaining counts.

In essence, there remain no genuine disputes of material fact as to Plaintiff's claims. In light of the circumstances of the encounter, Defendants' conduct was not unreasonable, and Defendants are immune for the actions they

took in effecting Plaintiff's arrest. Accordingly, Defendant's motion for summary

judgment is now granted in full.

## I.     BACKGROUND

### A.     Plaintiff attempts to live on his own in Philadelphia until he requires hospitalization for symptoms of paranoia and paranoid schizophrenia.

Starting in 2002, then 25-year-old Plaintiff was employed in Philadelphia,

Pennsylvania in various capacities, at one point spending approximately two

years as a client intake receptionist at a loan modification law firm.[1] Perhaps

most colorfully, Plaintiff worked for four years as a daytime radio talk show host

with a local station.[2] Plaintiff's talk show guests included former Pennsylvania

Supreme Court Justice Seamus P. McCaffery, prior to his Supreme Court tenure,

whose work Plaintiff "thought was interesting."[3]

Shortly thereafter, Plaintiff became involved with a woman whom he

attempted to date.[4] Before the dating ever began, however, Plaintiff suspected

that he had become a target of the woman's ex-boyfriend, an apparently jealous

---

[1]     ECF No. 36, Ex. 2, Kircher Dep. 13:03–09, Oct. 15, 2014.

[2]     Id. at 14:25–15:11.

[3]     Id. at 16:01–04.

[4]     Id. at 26:21–27:02.

lover, who Plaintiff believed responsible not only for a rash of threatening emails but also for a mysterious visit at his home from a gang of "unsavory characters" who may have flashed a gun at Plaintiff.[5] Plaintiff allegedly informed the Philadelphia Police Department, but ultimately concluded "that there's nothing they can do until something happens."[6]

Despite Plaintiff's perceived non-response from law enforcement, his parents suggested that he speak to someone about the situation.[7] So, Plaintiff contacted a counselor whose office was located across the street from Underwood Memorial Hospital in Woodbury, New Jersey.[8] During counseling, Plaintiff was asked whether he had ever considered committing suicide.[9] Plaintiff responded that he had.[10] As a consequence, Plaintiff involuntarily spent the following three days in Underwood Memorial Hospital, during which time suicidal thoughts continued to cross his mind.[11]

---

[5]  Id. at 25:03–12.

[6]  Id. at 25:23–26:07.

[7]  Id. at 24:07–08.

[8]  Id. at 23:20–24; 24:07–08.

[9]  Id. at 24:09–10.

[10]  Id. at 24:10–11.

[11]  Id. at 24:16–25:02.

According to Plaintiff, doctors at Underwood Memorial diagnosed him with "paranoid issues."[12] When asked during his deposition to explain what that diagnosis meant exactly, Plaintiff responded that it was his understanding that he "was paranoid, borderline schizophrenia."[13] Doctors prescribed Plaintiff appropriate medications, and he was thereafter referred to an outside psychiatrist.[14] Plaintiff characterizes the whole situation as "a bad time in [his] life" that led to depression.[15] It ultimately resulted in Plaintiff, at the age of 30, selling the Philadelphia home he had purchased when he was 21 and returning home to live with his parents in Gibbstown, New Jersey for approximately two years.[16]

When further pressed as to the specific diagnosis he eventually received from his psychiatrist, Plaintiff stated that he did not recall.[17] Instead Plaintiff's mother handled all of his medical paperwork and retained "stacks of everything

---

[12]   Id. at 27:20–24.

[13]   Id. at 28:04–07.

[14]   Id. at 28:12–29:17.

[15]   Id. at 48:05–09.

[16]   Id. at 20:15–21:13.

[17]   Id. at 47:22–48:03.

as far as what occurred."[18] According to Plaintiff, he suffers from anxiety when he reads his reports, "so I just go to the doctors and tell them what I'm dealing with and all the symptoms, and then they file their reports."[19] "My mother keeps all my medical reports."[20]

When asked whether he believed that he was in fact a paranoid schizophrenic, Plaintiff responded, "I don't like it, [but] I have to go with what the experts have diagnosed me with."[21] In Plaintiff's own words, he viewed the paranoid schizophrenic diagnosis as something akin to a "scarlet letter" that could hinder his lifetime goals, which included "plans . . . to someday be independently wealthy and run for public office in some capacity."[22] In fact, evidence produced in this matter as to a later hospitalization at a different institution revealed that after hospital staff characterized Plaintiff as a paranoid schizophrenic, his mother subsequently requested that his medical records be

---

[18]   Id. at 48:05–12.

[19]   Id. at 88:17–22.

[20]   Id. at 88:17–18.

[21]   Id. at 68:09–12.

[22]   Id. at 101:09–11.

amended to reflect that her son suffered merely from paranoia.[23] When asked

why, Plaintiff explained that his mother "knew I have had a hard time with it

because of the scarlet letter piece."[24]

> **B.      After attempting to live alone once more, Plaintiff again returns home to live with his parents. He becomes increasingly stressed and perceives his life to be spiraling downward.**

After this first mental health episode, Plaintiff returned to Philadelphia in

2009, this time living alone in an apartment in the city's Spring Garden

neighborhood.[25] During this period, Plaintiff started a t-shirt printing business

eponymously named Kircher Custom Apparel.[26] In due course, Plaintiff rented

office space for his small business and began spending increasingly more time

there, so much so that he no longer considered it worthwhile to pay both his

residential and business rent.[27] As a consequence, Plaintiff explains that he chose

---

[23]  Id. at 99:22–25.

[24]  Id. at 100:02–03.

[25]  Id. at 11:08–16.

[26]  Id. at 11:23–12:04.

[27]  Id. at 11:18–22.

to move back in with his parents in 2011 at the age of 34 to focus all of his resources on building the business.[28]

As Plaintiff himself described the situation, he "was under a lot of stress at the thought of moving back into my parents' house at age 34 . . . into my childhood room."[29] Specifically, around that time, Plaintiff ended a romantic relationship because neither he nor his girlfriend had their own places.[30] As he put it, the couple did not have "any type of privacy or sanctuary anymore."[31] This was particularly upsetting for Plaintiff, as he was "truly fond" of her and felt "that she had become a part of [his] future plans."[32] "I don't feel it's natural to be living with your mother and father, and I was unhappy about it," Plaintiff admitted.[33]

As Plaintiff further described the situation, he "was just unhappy and, you know, all the things that come with that."[34] When asked whether he found

---

[28]   Id. at 11:17–22 & Ex. 2.

[29]   Id. at 103: 18–20 & Ex. 2.

[30]   Id. at 103:21–25.

[31]   Id. at  103:24–104:01.

[32]   Id. at Ex. 2.

[33]   Id. at 104:04–05.

[34]   Id. at 104:09–10.

himself pacing rooms a lot during this time, Plaintiff responded that he did.[35]

Plaintiff would ask himself, "How can I make money fast?"[36] "I got to get this

business off the ground."[37] "I'm going to have to hustle," he thought.[38]

Still, Plaintiff explained that he "felt that the sacrifice would pay off in the long

run once [his] business was built."[39] Plaintiff knew he had "a long road" ahead of

him, a road that he knew would be "very difficult and . . . stressful."[40]

> **C.** **On the spur of the moment, Plaintiff decides to drive cross-country, from New Jersey to California, "to hit the reset button" on life.**

Unfortunately for Plaintiff, "business was slow," and he was frustrated

with the prospect of being unable "to support [himself] in this economy."[41]

Plaintiff worried about "where am I going to get my next order from and, you

know, what prospecting should I do, those types of things."[42] "The leads were

---

[35] Id. at 104:11–12.

[36] Id. at 104:13.

[37] Id. at 104:13–14.

[38] Id. at 104:15.

[39] Id. at Ex. 2.

[40] Id. at 104:18–20.

[41] Id. at 104:06 & Ex. 2.

[42] Id. at 107:16–18.

not coming in, no leads were converting into new business."[43] Accordingly, as his business prospects became "bleaker," Plaintiff took the rather curious step that would set this litigation's plot into motion. On Monday, September 12, 2011, Plaintiff, having never driven alone in a car for longer than approximately two hours, decided to set out on a cross-country trip from New Jersey to California, at which endpoint he hoped to meet up with a cousin of his.[44]

According to Plaintiff, the purpose of his trip was to "hit the reset button" on life and "refocus [himself] and look to come back here and get on the hard road to building up a business."[45] Plaintiff admits that his decision was made spontaneously, given that he "hadn't planned too far ahead of time" for it.[46] In fact, he "had been thinking about it the days leading into it" before he "decided in the middle of the day, one day, to leave."[47] When asked for a specific date on which he decided September 12, 2011 would be his day to leave, Plaintiff

---

[43]  Id. at 107:25–108:01.

[44]  Id. at 106:07–08; 108:18–24.

[45]  Id. at 106:08–10.

[46]  Id. at 105:25–106:01.

[47]  Id. at 106:14–16.

approximated that he had so decided on the 10th or 11th of September, sometime "around there."[48]

When opposing counsel asked Plaintiff if he prepared for the trip, he responded, "No, I made the decision, and I got in my car, and I left."[49] Plaintiff did not pack any luggage.[50] Instead, he "left everything behind."[51] He did not take a map or use a GPS,[52] he did not take spare clothes or clean underwear,[53] and he did not worry about gas money, because he "had a newer car with really good gas mileage."[54] Moreover, Plaintiff stated that he did not have a good sense of how long it would take to drive from New Jersey to California.[55] Plaintiff further admitted to having "a little over $1,000" in a bank account, as well as money in his wallet that he could have used.[56] State Police records would later reveal that, at the time of the underlying incident, Plaintiff had one blank check,

---

[48] Id. at 106:23.

[49] Id. at 109:11–12.

[50] Id. at 113:01–03.

[51] Id. at 113:04.

[52] Id. at 111:25–112:10; 113:03–04.

[53] Id. at 113:05–06.

[54] Id. at 113:10–13.

[55] Id. at 114:07–10.

[56] Id. at 113:06–09.

$8 in American currency, and $10 in Canadian currency on his person.[57] As Plaintiff describes it, he "took off," planning "to drive until [he was] tired and stop at hotels along the way."[58]

Notably, Plaintiff testified that his lack of preparation was primarily a consequence of his desire to conceal the impending trip from his parents.[59] Plaintiff did not want "to cause an argument" and was afraid that once his plan was revealed, his father would take the keys to his car away from him.[60] According to Plaintiff, his father would say, "Don't do that. You're not planning on it. It's out of the blue."[61] So, Plaintiff instead left secretly without letting them know, determined to contact his parents only "after I got there or somewhere along the way."[62]

---

[57]   ECF No. 36 Ex 8 at 41.

[58]   Kircher Dep. 112:10; 112:14–15.

[59]   Id. at 113:20–21.

[60]   Id. at 113:23–24.

[61]   Id. at 114:04–06.

[62]   Id. at 113:21–22.

### D. Plaintiff begins his trip, but on the second evening, becomes lost in Emporium, Cameron County, Pennsylvania.

Sometime in the middle of the afternoon on September 12, 2011, Plaintiff left his parents' home in Gibbstown, New Jersey and began driving to California.[63] Thereafter, Plaintiff "drove as far as [he] could until [he] was tired, and then [he] got a hotel room."[64] Plaintiff recalls driving about as far as Strasburg, Lancaster, Pennsylvania, on his first day of travel, a location approximately one hour and twenty minutes west of his home.[65]

Plaintiff slept in a motel room that evening and departed the next morning, September 13, 2011, sometime prior to the eleven o'clock or noon checkout hour.[66] Plaintiff believes he may have gotten a danish at the motel brunch before leaving, though he does not remember eating lunch or dinner on the second day of his trip, except perhaps for a sandwich or a quick snack from a gas station if he stopped.[67] At some point in the late evening hours of Tuesday, September 13 or the early morning hours of Wednesday, September 14, Plaintiff

---

[63] Id. at 109:17–110:01.

[64] Id. at 109:22–24.

[65] Id. at 111:01–08.

[66] Id. at 111:11–15.

[67] Id. at 120:06–12.

became tired again and exited the road on which he was traveling (later determined to be Interstate 80-West) to "potentially get a hotel room or, you know, make a pit stop."[68] "And that's when I got lost."[69]

According to Plaintiff, "I took an exit and it was dark out, and it was in, you know, a rural area, and the next thing I knew, I was lost."[70] When opposing counsel asked Plaintiff from which road he was lost, Plaintiff explained that it was "whatever the major artery is heading west," though he did not know which number route that was.[71] Apparently unbeknownst to Plaintiff at that time, he had become lost in the Emporium, Cameron County area of northcentral Pennsylvania, a location approximately four hours northwest of Strasburg, Pennsylvania and only five hours northwest of Gibbstown, New Jersey.[72]

**E.** **Plaintiff has his first encounter with Pennsylvania State Police on the night in question.**

Once off the main thoroughfare, Plaintiff, admitted that he was driving "very slowly, slower than the speed limit" so that he might locate traffic signs

---

[68]   Id. at 111:16–19.

[69]   Id. at 111:20.

[70]   Id. at 112:18–20.

[71]   Id. at 112:21–24.

[72]   Id. at 58:11–12; 111:11–12.

along the roadway.[73] At that point, around approximately 12:30 a.m. on

September 14, Corporal Eric M. Farabaugh and Trooper Dennis Miller, riding

together in the same Pennsylvania State Police patrol car, activated the car's

emergency lights to signal to Plaintiff that he was lawfully required to stop.[74] The

two officers belong to the Pennsylvania State Police Troop F, located at the

Emporium Barracks.[75] According to Trooper Miller, this preliminary stop was

initiated not only because Plaintiff's vehicle was moving at a dangerously slow

speed, but also because the surrounding neighborhoods had seen several

burglaries in recent weeks, and the pair suspected Plaintiff may have been casing

homes to burglarize.[76]

Plaintiff informed the officers that he was lost and headed to California.[77]

The officers requested Plaintiff's license and processed it through the

Pennsylvania Department of Transportation's driver database.[78] The results

revealed that there were no outstanding warrants for Plaintiff and that the

---

[73]   Id. at 121:15–17.

[74]   Id. at 121:13–122:01.

[75]   ECF No. 35 at 2 ¶¶ 3–4; ECF No. 45 at 1 ¶¶ 3–4.

[76]   ECF No. 36, Ex. 4, Miller Dep. 56:09–19; 57:09–14., Apr. 28, 2014.

[77]   Kircher Dep. 116:11–12.

[78]   Id. at 57:21–58: 06.

vehicle was in Plaintiff's lawful possession.[79] Plaintiff does not recollect whether he specifically asked the officers for directions, but he does recall informing them that he was a "lost motorist."[80] Regardless, it is not disputed that the officers then informed Plaintiff that he could be on his way.[81] Afterward, Corporal Farabaugh testified that, during this initial stop, the officers did not search Plaintiff's person, his vehicle, or any compartments or containers within it, and therefore had no knowledge as to whether Plaintiff had a weapon or any illicit substances in his immediate possession.[82]

### F.      Plaintiff, still lost, stops his vehicle partially in the roadway, turns off his headlights, and is approached by a volunteer firefighter.

At approximately 3:00 a.m. that same morning, two-and-a-half hours after he was first stopped by police, Plaintiff still found himself lost from the main thoroughfares.[83] Although not conclusively stated, it appears as though Plaintiff remained lost the entire period from 12:30 a.m. through 3:00 a.m., never

---

[79]   ECF No. 35 at 3 ¶ 14; ECF No. 45 at 2 ¶ 14.

[80]   Kircher Dep. 117:03–07.

[81]   ECF No. 35 at 3 ¶ 14; ECF No. 45 at 2 ¶ 14.

[82]   Criminal Trial Tr., ECF No. 36 Ex. 5 at 50:02–04; 77:15–25 (Cameron County Court of Common Pleas, Oct. 10, 2012).

[83]   Id. at 18:02–07; Kircher Dep. 117:16–17.

returning to Interstate 80 West, the highway on which the parties believe he was previously traveling.[84]  According to Plaintiff, there was insufficient space to pull completely off the road, so he stopped his car "over to the side of the road."[85]

At the same time, Plaintiff shut off his headlights and activated his hazard lights.[86] When asked why he turned his headlights off, Plaintiff explained that it was "out of force of habit," and that "when I pull over, I typically do that."[87] Plaintiff stated that the whole purpose of his stopping on the roadway was to attempt to "tune in to maybe a traffic report or something on the radio."[88] When asked by opposing counsel how turning on the radio would have helped him find his way, he answered "Well, see what town I'm in or where's the local highway or just to get my bearings."[89]

At that point, Nathan D. Ball, a local volunteer firefighter happened to be driving along the same road as Plaintiff. Seeing Plaintiff's car on the side of the road without its headlights on, Mr. Ball stopped his vehicle behind Plaintiff's,

---

[84]   ECF No. 35 at 3 ¶ 14; ECF No. 45 at 2 ¶ 14.

[85]   Kircher Dep. 123:07–10.

[86]   Id. at 123:10–13.

[87]   Trial Tr. at 88:03–08.

[88]   Kircher Dep. 123:12–13.

[89]   Id. 127:08–09.

activated his four-way hazard lights, exited his vehicle, and approached Plaintiff's car from the driver's side "to see if he was okay."[90] Mr. Ball, who had previously served in the United States Army and who was the elected assistant fire chief for the Sinnemahoning Fire Department at the time of the incident, was driving with a girlfriend in his personal vehicle.[91] Although Mr. Ball's vehicle was equipped with red emergency lights, he did not activate them at that time.[92]

Mr. Ball was, however, unable to say anything to Plaintiff.[93] As Mr. Ball approached Plaintiff's car on foot, Plaintiff "proceeded to drive up the road without his headlights on," traveling at a speed of approximately 15 to 20 miles per hour.[94] Mr. Ball returned to his vehicle and continued to follow Plaintiff's car at a slow speed, keeping a safe distance, and still refraining from activating his red emergency lights.[95] When asked why he continued to follow Plaintiff's car,

---

[90]   ECF No. 36, Ex. 6, Ball Dep. 14:11–21, Jun. 24, 2014.

[91]   Id. at 07:14–15; 11:09–16; 14:11–21.

[92]   Id. at 14:22–25.

[93]   Id. at 15:24–25.

[94]   Id. at 14:20–21; 17:05–06.

[95]   Id. at 17:07–10; 17:18–21.

Mr. Ball testified that "I was concerned for the other people that may be coming towards him."[96]

Sometime shortly thereafter, Mr. Ball observed a vehicle approaching the two-car caravan in the opposite direction.[97] Out of concern for the oncoming driver's safety, Mr. Ball deemed it appropriate to activate his emergency lights.[98] Mr. Ball explained that "if I'm trying to protect the safety of other people" or "if there's incidents where there may be public safety at harm," he believed he was rightfully permitted to activate his emergency lights.[99]

At that point, Mr. Ball also notified his local dispatcher as to the hazard that he perceived Plaintiff to be creating.[100] The record reveals that although Mr. Ball could not speak directly to the Pennsylvania State Police, the dispatcher was able to function as a go-between throughout the night, relaying location

---

[96]   Id. at 17:16–17.

[97]   Id. at 17:18–21.

[98]   Id. at 17:18–21.

[99]   Id. at 18:02–4; 18:24–19:02.

[100]   Id. at 19:13–16.

information and vehicle details from Mr. Ball, through the dispatch system,

ultimately to the patrol car that carried the two officers who responded.[101]

### G. State Police Officers Corporal Eric M. Farabaugh and Trooper Dennis Miller, having been dispatched to respond to a vehicle traveling without its headlights on, begin to pursue Plaintiff's vehicle after he refuses to stop.

Police communications officer Anne Locey was informed of "a vehicle

going through the Sinnemahoning area without its lights on."[102]

Communications officer Locey was also told that "he's driving up the middle of

the road with no lights on right now."[103] "Middle road, no lights," Locey

confirmed.[104] Locey then relayed this information to Corporal Farabaugh and

Trooper Miller, keeping them abreast of the vehicle's present location and any

other updates.[105]

The officers' approach and pursuit of Plaintiff was recorded by the

dashboard camera in the officers' patrol car, otherwise referred to as a "mobile

---

[101] See, e.g., id. at 19:17–22.

[102] ECF No. 36, Ex. 9, Tr. of Police Communication Telephone Call Records, at 02:10–12.

[103] Id. at 05:18–19.

[104] Id. at 05:21.

[105] ECF No. 36, Ex. 12, Tr. of 911 State Police Call Complaint Records, at 10:17–11:04; 11:06–14.

video recorder" or an "MVR."[106] A declaration by Corporal Kellis B. Martz

authenticating the video recording in this case was provided by Defendants for

the record.[107] I have reviewed the video recording, and the following recounting

of the facts is compiled from the undisputed visual and audio components of the

recording, as well from several of the parties' depositions.

At 3:01 a.m., the officers pulled their patrol car perpendicular to the

roadway on which Plaintiff was traveling and waited for further instruction as to

the vehicle's whereabouts.[108] The officers hoped to pull into the roadway and

block traffic.[109] Approximately one minute later, the officers activated the patrol

car's blue and red overhead lights.[110] At 3:03 a.m., the officers left the side of the

road and pulled into the right hand lane, moving in the direction toward which

Plaintiff was driving.[111] Approximately 20 seconds later, Plaintiff's headlights can

---

[106] ECF No. 36, Ex. 7. According to Corporal Farabaugh, once the patrol car's lights have been activated, the video begins recording, including a one-minute back-up period preceding activation. Trial Tr. at 38:20–22.

[107] ECF No. 36, Ex. 7.

[108] MVR at 3:01 a.m.

[109] Tr. of 911 State Police Call Complaint Records at 11:10–12.

[110] MVR at 3:02 a.m.

[111] Id. at 3:03 a.m.

be seen on the MVR rounding a bend.[112] The officers pull the patrol car into the

opposite lane so as to approach Plaintiff in a face-to-face fashion.[113] One of the

officer's hands is visible, making a "stop" motion in Plaintiff's direction.[114] That

officer begins walking toward Plaintiff's driver side window, but Plaintiff

reverses the car, driving backwards down the middle of the road.[115]

At approximately 3:04 a.m., as Plaintiff is reversing, the officers attempt a

precision immobilization technique ("PIT") maneuver, by placing the right front

quarter panel of the patrol car against the left front quarter panel of Plaintiff's

car.[116] At first blush, the PIT maneuver appears successful; however, Plaintiff's

vehicle spins 180 degrees and resituates, so that he is able to continue driving in

the opposite direction from which he was originally headed.[117] The police cruiser

also turns around and begins following Plaintiff down the road.[118]

---

[112] Id.

[113] Id.

[114] Id.

[115] Id.

[116] Id. at 3:04 a.m.

[117] Id.

[118] Id. at 3:04–05 a.m.

It takes the officers approximately thirty seconds to catch up with Plaintiff's car after it passes them, but when they do, it becomes apparent that Plaintiff is driving at a low rate of speed.[119] Trooper Miller estimated that Plaintiff's vehicle was likely traveling less than 20 miles per hour.[120] Plaintiff explained that he "continue[d] to roll away very slowly . . . because I was fearful" and "hoping that backup would arrive or I can pull into a lit park lot or something and the situation would calm down."[121]

For the next ten minutes, the pursuit continued, with the police frequently attempting to perform a subsequent PIT maneuver on Plaintiff's vehicle.[122] However, those attempts were unsuccessful for two principal reasons. First, the officers aborted multiple attempts, explaining in their depositions that the winding nature of the road rendered it potentially dangerous for any oncoming traffic should either vehicle become momentarily disabled in the roadway.[123]

---

[119]   Id. at 3:05 a.m.

[120]   Miller Dep at 42:16–25.

[121]   Kircher Dep at 124:05–11.

[122]   MVR at 3:05 a.m.

[123]   Trial Tr. at 32:07–10 ("I chose not to do any of those due to the curviness of the road. I didn't want to have two vehicles disabled in the roadway and get struck by oncoming traffic.").

Second, at several points, Plaintiff resisted the officers' attempts to PIT his car, accelerating forward and blocking the adjacent lane when they would attempt to pull alongside him.[124]

For the record, I also note that the MVR reveals that, during this period of time, Plaintiff's vehicle passed several open areas on the right hand side of the road that would have permitted him ample time and space to safely pull his vehicle over. The MVR also reveals that the officers' emergency lights were continuously activated during this portion of the pursuit, the car's sirens were blaring loudly, and the officers utilized a spotlight from within the car to signal to Plaintiff.

Nevertheless, in continuing to resist the officers' attempt to stop his car, Plaintiff repeatedly drove in the middle of the road, crossing over the double yellow median line several times, and generally driving in a slow, weaving pattern resembling that of a driver who was under the influence of some substance. In fact, one of the officers suspected at the time that Plaintiff may have been under the influence of bath salts.[125] "It was my impression, after the first

---

[124]  <u>See, e.g.,</u> MVR at 3:09; 3:10; 3:11.

[125]  Miller Dep. 31:20–32:02.

stop that we made," Trooper Miller explained, "for someone to totally act the way he was and for the problems we've had in that area at that time with bath salts and other drugs like that . . . it was my impression that he was under the influence of something that affected him."[126]

At approximately 3:13 a.m., ten or so minutes into the pursuit, Plaintiff's vehicle stops, one of the officers begins approaching the car, but Plaintiff again accelerates, and the pursuit continues.[127] For the next five minutes, Plaintiff contains driving at a slow pace, in the middle of the road, weaving in and out of both lanes, disregarding the officers' commands to stop his vehicle.[128]

The first significant stoppage of Plaintiff's car occurs at 3:18 a.m., approximately fifteen minutes after the pursuit began.[129] At that point, the officers, with their car's emergency lights still flashing, shine the spotlight on Plaintiff.[130] Both officers can be heard shouting variants of "Stop your vehicle!"; "Open the door, get out of your car!"; "Hey, Paul, get of the car now!"; and "Hey,

---

[126] Id. at 31:20–32:02.

[127] MVR at 3:13 a.m.

[128] Id. at 3:13– 3:18 a.m.

[129] Id. at 3:18 a.m.

[130] Id. at 3:19 a.m.

Paul, roll your window down!"[131] Plaintiff's vehicle remains stopped for approximately two-and-a-half minutes before one of the officers exits the patrol car and attempts to speak with Plaintiff from the right rear area of Plaintiff's vehicle, in order to distract Plaintiff long enough to smash out a window.[132] Plaintiff slowly pulls his car forward, but the officer persists in attempting to establish a line of communication for about minutes.[133] At that point, the other officer approaches Plaintiff's vehicle from the rear driver's side, while holding his handgun in a ready position so as to provide cover for his partner.[134]

Plaintiff admits that by this point in the encounter he "recognized [the officers] as the same guys I met with earlier, the same guys that pulled me over. I thought in my mind, it's the same guys from earlier."[135] Nevertheless, Plaintiff pulled forward again, ultimately fleeing the scene again at 3:26 a.m. by taking the intersecting road, now more than twenty minutes since police initiated the

---

[131]  Id. at 3:18–3:20 a.m.

[132]  Id. at 3:21 a.m.

[133]  Id. at 3:21–3:25 a.m.

[134]  Id. at 3:25 a.m.

[135]  Kircher Dep. 133:24–134:02.

pursuit.[136] When asked why he did not cooperate with the two officers, having recognized them, Plaintiff answered "because they knew I was a lost motorist, and I was being treated like I was an armed maniac. . . . I was hoping for backup because it was such an escalated, terrifying situation."[137] At this point, the officers also recognize Plaintiff as the motorist they had encountered earlier in the night.[138]

Despite Plaintiff having turned on his headlights, by this point in the encounter, Corporal Farabaugh explained that the pursuit continued because Plaintiff "was going to be arrested for fleeing and eluding."[139] The officers also proceeded to call for backup from the Lamar, Clinton County Barracks.[140]

**H.    After approximately twenty minutes of pursuing Plaintiff, the officers eventually succeed in stopping him by pinning his car against an embankment. After his vehicle is stopped, Plaintiff continues to resist arrest and refuses to exit his car. Following an additional fifteen-minute long struggle, the officers ultimately break Plaintiff's windows, deploy their tasers, and drag Plaintiff out of his car, as he still fails to cooperate with their instructions.**

---

[136]   MVR at 3:26 a.m.

[137]   Kircher Dep. 134:06–07; 134:16–17.

[138]   Trial Tr. at 64:01–04.

[139]   Id. at 44:24–45:02 ("Q. Now he's got them on now. Why didn't you just let him go?").

[140]   MVR at 3:23–3:24 a.m.

At 3:26 a.m., the officers secured a favorable angle to perform the PIT

maneuver and attempted to pin Plaintiff's car against a guard rail.[141] However,

after being pinned for approximately 5 seconds, Plaintiff managed to reverse,

freeing himself from the grip of the patrol vehicle and the nearby guardrail.[142] As

Plaintiff accelerates in reverse, an officer can be heard exiting the patrol car and

shouting, "Paul, I'm telling you, I'll shoot you!"[143] After Plaintiff freed his

vehicle, he reversed in such a direction as to leave his vehicle perpendicular with

a nearby embankment.[144] At that point, the officers rammed the front right

quarter panel of Plaintiff's car, effectively pinning it against the embankment.[145]

For approximately one minute, as Plaintiff again attempts to accelerate and

break free, smoke can be observed from burning tires, and the fronts of the two

cars continually rock back and forth as a consequence of Plaintiff's

---

[141]  Id. at 3:26 a.m.

[142]  Id.

[143]  Id.

[144]  Id.

[145]  Id.

accelerating.[146] Screeching wheels can be heard on the video recording, and one officer instructs the other, "You're good. Just keep it there. Keep it in drive."[147]

Once the officers determine that Plaintiff's car appears to be pinned and that it is momentarily safe to exit the cruiser and approach the vehicle, an audible "Get out of the car! Get out of the car!" can be heard.[148] Although the front of Plaintiff's vehicle is situated partially off-screen on the MVR due to the angle of the pin, the audio and partial screenshots are still captured. The officers appear to the break the front passenger side window.[149] Variations of "Get of the car, now!" can then be heard on the MVR at least six times.[150]

When asked whether he ever put the car in park, Plaintiff stated that "it was still in drive."[151] Opposing counsel asked, "At any point in time, did you put it in park?" "I don't believe so," Plaintiff responded.[152] When asked whether he kept his foot on the gas pedal, Plaintiff answered, "No, I mean I probably tried to

---

[146]  <u>Id.</u> at 3:26–3:27 a.m.

[147]  <u>Id.</u> at 3:27 a.m.

[148]  <u>Id.</u>

[149]  <u>Id.</u>

[150]  <u>Id.</u>

[151]  Kircher Dep. 139:24–25.

[152]  <u>Id.</u> at 140:01–02.

roll out just to keep going so slow. . . . My goal was to continue to go slow until someone else would arrive and then the situation would calm down hopefully, or I could get into a well-lit area."[153] Plaintiff further stated that he "knew immediately [his] car wasn't going anywhere," but he "might have been hitting pedals while the struggle was going on."[154] Trooper Miller explained that he considered Plaintiff's vehicle, given its entrapment and Plaintiff's attempts to dislodge it, to be a deadly weapon.[155]

Officers again warn Plaintiff to "Get out of the car!"[156] Shortly thereafter, additional glass is observed breaking, and one of the officers can be heard shouting "Tase him! Tase him!"[157] Deployment of the taser can be heard on the MVR as a rhythmic, clicking sound.[158]

As soon as the first five-second cycle of the taser deployed by Corporal Farabaugh had completed, Corporal Farabaugh observed Plaintiff break the wire

---

[153]  Id. at 140:03–09.

[154]  Trial Tr. at 102:12–17.

[155]  Miller Dep. 46:09–15.

[156]  MVR at 3:27 a.m.

[157]  Id.

[158]  Trial Tr. at 70:23–71:01.

leads off. [159] He was under the impression that the taser had no effect on

Plaintiff.[160] In fact, even after the taser was first discharged, the video shows that

Plaintiff accelerated his vehicle, revving the engine and lurching the car forward

in subsequent attempts to dislodge it.[161] After the first two discharges of the

taser, Plaintiff remained in his car, which continued to sporadically lurch

forward.[162] The officers can be observed crossing to the front of the car and

breaking the driver's side window.[163] The officers continue instructing Plaintiff to

open the door and get out of the car.[164] Plaintiff can be heard repeatedly yelling,

"Get off me!"[165] At some point shortly thereafter, the windshield wipers and the

horn on Plaintiff's car both become activated.[166] The officers audibly instruct each

other to attempt to get the keys out of the ignition of Plaintiff's vehicle.[167]

---

[159] Id. at 34:1–5.

[160] Id.

[161] MVR at 3:27–3:28 a.m.

[162] Id. at 3:28 a.m.

[163] Id.

[164] Id. at 3:28–3:29 a.m.

[165] Id.

[166] Id.

[167] Id.

The officers continue to struggle in their attempt to remove Plaintiff from the car, even after deploying their tasers three to four times and grappling with Plaintiff for approximately four minutes.[168] They continue to instruct Plaintiff to get out of the car.[169] Trooper Miller explained that Plaintiff's hands "never really left" the wheel.[170] Instead, Trooper Miller suggested that "we would get one hand pulled away from the steering wheel, and he would wrestle it away, and we'd try to get the other hand, and he'd put his other hand back on, so it would alternate times of when his hands were gripping the steering wheel."[171] When asked how Plaintiff was resisting, Trooper Miller further recalled that "by keeping his hands—gripping the steering wheel. And, you know, he was just basically trying to block me when I was—when I tried to get the keys, I was trying to get the keys from the back seat."[172] "So I was reaching over top of him,

---

[168]  Id. at 3:29–3:30 a.m.

[169]  Id.

[170]  Miller Dep. 79:02–06.

[171]  Id. at 79:06–11.

[172]  Id. at 79:15–19.

and he was blocking me with his body so that he could keep the vehicle going."[173] Corporal Farabaugh characterized Plaintiff as "pretty powerful."[174]

When asked about attempts to resist arrest, Plaintiff testified "I just held on to the steering wheel for dear life. I've always been taught that when you're dealing with the police, keep your hands on the steering wheel at all times, and that's what I did."[175] "Anytime my hands were off the steering wheel," Plaintiff explained, "they were just like this (witness physically indicating) to shield myself from the tasers and stuff."[176] Plaintiff admits that "I was just holding on to the steering wheel and yelling, 'What did I do?'"[177]

Eventually, Trooper Miller was able to fasten a handcuff around one of Plaintiff's hands and use the other cuff as leverage to attempt to pull Plaintiff from the vehicle.[178] The officers then secured Plaintiff's other hand with another set of handcuffs and attempted to pull him across the seat and out of the door.[179]

---

[173]   Id. at 79:19–21.

[174]   Trial Tr. at 54:04–05.

[175]   Kircher Dep. 126:16–20.

[176]   Id. at 126:20–23.

[177]   Id. at 141:23–25.

[178]   Id. at 3:34 a.m.

[179]   Miller Dep. 83:14–16.

At the same time, Plaintiff attempted to kick the officers.[180] "When you're done fighting, we're done fighting," one of the officers can be heard instructing.[181]

At that point, Corporal Farabaugh observed Plaintiff reaching for his pocket and attempted to place Plaintiff's hands behind his back.[182] "I was trying to pin his hands down to keep him from getting his pocket," Corporal Farabaugh explained.[183] Plaintiff can still be heard moaning loudly at this point in the MVR.[184] As he was being forcibly removed from his vehicle, Plaintiff purportedly jammed his head in the space between the seat and the pillar of the door.[185] After he did so, the officers grabbed Plaintiff's hair to dislodge his head and remove him from the vehicle.[186] The officers eventually succeed in extricating the Plaintiff from the car, with an audible struggle still persisting even after Plaintiff is in custody.[187]

---

[180] Id. at 3:34 a.m. Miller Dep. 80:18–19.

[181] Id.

[182] MVR at 3:35 a.m. Trial Tr. at 53:21–54:01.

[183] Trial Tr. at 54:01–03.

[184] MVR 3:38–3:40 a.m.

[185] Miller Dep. 83:21–24.

[186] Id. at 83:24–84:01.

[187] MVR at 3:40–3:40 a.m.

"Just let us know when you're ready to cooperate," "Don't fight," "Stop fighting," "Put your feet down," and "Get on your stomach," the officers still instruct Plaintiff.[188] The entire confrontation has thus lasted approximately 45 minutes, with the encounter following the final entrapment of Plaintiff's vehicle having lasted approximately 15 minutes.

I.    **The Pennsylvania State Police Trained Corporal Farabaugh and Trooper Miller as to proper taser usage, training which the pair principally followed during the instant encounter.**

Both officers explained that they were required to pass an exam and undergo a six-month training period, known as the academy, before officially joining the state police as troopers.[189] Corporal Farabaugh and Trooper Miller graduated from the academy in 1999.[190] The academy covered various topics related to the use of force, including excessive force, the continuum or progression of force, oral commands, etc.[191]

---

[188]   Id. at 3:41–3:43 a.m.

[189]   Farabaugh Dep. 13:07–14; Miller Dep. 11:11–12:04.

[190]   Id.

[191]   Farabaugh 13:18–14:04; Miller Dep. 12:05–17.

The academy period at that time did not include training on tasers, as the Pennsylvania State Police had not authorized their use until 2008.[192] Thus, shortly after the tasers became authorized for use in 2008, officers were required to attend a day-long, eight-hour training session.[193] A refresher course similar to the initial training was conducted annually thereafter.[194] In fact, at one of these courses, Corporal Farabaugh volunteered to be tased so that he could feel the effects of a single deployment.[195]

According to the officers' testimony, the primary warning topics they received during training included:

(1)     high-risk populations upon whom tasers should not be deployed: pregnant women, small children, the elderly, etc.;[196]

(2)     situations in which tasers should not be deployed: where the subject is in water, where the subject is standing, where the subject could fall from a great height;[197]

---

[192]   Miller Dep 87:09–18.

[193]   Farabaugh Dep. 18:09–15.

[194]   Id. at 18:21–19:12.

[195]   Id. at 33–34.

[196]   Id. at 20:17–20

(3)     areas of a person's body at which the taser should be not be aimed

or deployed: near the eyes, the face, the groin, or directly above the

heart;[198] and

(4)     letting the taser run for a full cycle of five seconds once it is

deployed.[199]

When asked whether he was ever told that if a cycle lasts more than five

seconds, it could cause harm or disorientation or problems to an individual who

may be tasered, Corporal Farabaugh answered that he had not been so

informed.[200] When questioned about the ideal timeframe between deployments

of a taser, Corporal Farabaugh answered that "it would depend on the

circumstance."[201]

Corporal Farabaugh stated that he received a written copy of the

Pennsylvania State Police policy and training materials relating to general

policing tactics, though the parties dispute the extent to which those documents

---

[197]   Id. at 20:12–16.

[198]   Miller Dep. 16:14–20.

[199]   Id. 28:06–10.

[200]   Farabaugh Dep. 26:06–10.

[201]   Id. 33:15–22.

regulated taser usage specifically.[202] Corporal Farabaugh recalled that the

training required officers to automatically seek medical attention for subjects

who have sustained multiple taser deployments at one time, a significant

number of deployments, or a single prolonged deployment.[203] When asked

whether he was ever trained as to whether multiple deployments to an

individual could cause injury or serious bodily harm, Corporal Farabaugh

answered that he had no knowledge of that.[204] Trooper Miller's recollections

were largely identical to Corporal Farabaugh's on the issues relating to

training.[205]

Prior to the incident, Corporal Farabaugh testified that he only ever was

forced to deploy his taser on two different occasions prior to the night in

question, both times requiring only a single discharges of his taser.[206] Trooper

---

[202] Id. at 27:12–30:19.

[203] Id. at 31:14–23.

[204] Id. at 32:03–07.

[205] Miller Dep. 27–28; 93–95.

[206] Farabaugh Dep., 120:13–121:05.

Miller also testified to using the taser during two distinct incidents prior to this case, both times also requiring only a single discharge of Trooper Miller's taser.[207]

The following graphic, Table 1, combines and enumerates the two officers' authenticated taser logs:

### Table 1. Taser Discharge Logs for Both Officers[208]

| No. | Time | Officer (#) | Duration | Time Between Discharges | Total Time Elapsed |
|-----|------|-------------|----------|-------------------------|--------------------|
| 1 | 3:37:11 | Farabaugh (1) | 0:05 | - | 0:05 |
| 2 | 3:37:20 | Farabaugh (2) | 0:05 | 0:04 | 0:14 |
| 3 | 3:39:24 | Farabaugh (3) | 0:04 | 1:59 | 2:17 |
| 4 | 3:40:18 | Miller (1) | 0:05 | 0:50 | 3:12 |
| 5 | 3:40:45 | Miller (2) | 0:05 | 0:22 | 3:39 |
| 6 | 3:40:54 | Miller (3) | 0:05 | 0:04 | 3:48 |
| 7 | 3:42:30 | Farabaugh (4) | 0:05 | 1:31 | 5:24 |
| 8 | 3:42:39 | Farabaugh (5) | 0:05 | 0:04 | 5:33 |
| 9 | 3:42:49 | Farabaugh (6) | 0:05 | 0:05 | 5:43 |

---

[207]   Miller Dep., 86:22–88:07.

[208]   ECF No. 45 Exs. 8 & 9.

| No. | Time | Officer (#) | Duration | Time Between Discharges | Total Time Elapsed |
|-----|------|-------------|----------|------------------------|--------------------|
| 10 | 3:43:00 | Farabaugh (7) | 0:05 | 0:06 | 5:54 |
| 11 | 3:43:21 | Miller (4) | 0:02 | 0:16 | 6:12 |
| 12 | 3:43:27 | Miller (5) | 0:05 | 0:04 | 6:21 |
| 13 | 3:43:37 | Miller (6) | 0:07* | 0:05 | 6:30 |
| 14 | 3:43:41 | Miller (7) | 0:03 | 0:00 | 6:33 |
| 15 | 3:43:53 | Miller (8) | 0:10 | 0:09 | 6:52 |
| 16 | 3:45:01 | Miller (9) | 0:02 | 0:58 | 7:52 |
| 17 | 3:45:20 | Miller (10) | 0:05 | 0:17 | 8:14 |

\* I note for the record that a logged duration of 0:07 seconds for this particular entry does not appear to accord with a subsequent firing from the same taser having occurred 0:04 seconds later.

Thus, the taser logs show that, over the course of the approximately eight minutes and fourteen seconds that the officers attempted to remove Plaintiff from his vehicle, the officers' tasers were deployed a total of seventeen times, for a total of approximately one minute and twenty-three seconds. According to Trooper Miller, Plaintiff must have been hit with less than seventeen deployments, as Trooper Miller himself was tased during the struggle at least "a

couple of times."[209] When asked why he did not disclose that fact in the pertinent

reports, Trooper Miller explained that he considered it irrelevant to Plaintiff's

ultimate criminal prosecution.[210]

The officers also utilized various modes of taser deployment on Plaintiff.

Specifically, Corporal Farabaugh recalls twice using the "probe" mode, in which

two probes carrying the current are deployed from the taser, and using five

"drive stuns" on Plaintiff, whereby the taser is held directly to the subject's body

as the current travels across the taser's stationary probes.[211] Trooper Miller only

recalled using the drive stun mode, believing that drive stun mode was less

painful and affected a smaller area of the body as a consequence of the short

distance between the taser's stationary probes.[212]

When asked what was going through his head as the altercation escalated,

Corporal Farabaugh responded that he was "scared."[213] According to Corporal

Farabaugh, he "didn't know if [Plaintiff] had any weapons in the vehicle," and so

---

[209]   Miller Dep. 27:02–07.

[210]   Id. at 27:08–22.

[211]   Farabaugh Dep. 54:21–55:23.

[212]   Miller Dep. 64:17–22; 66:06–12.

[213]   Trial Tr. at 78:01–03.

he responded to Plaintiff's conduct with the primary intent "to protect Trooper Miller and [himself]."[214] Corporal Farabaugh also explained that "every time I utilized the Taser was in an attempt to take [Plaintiff] into custody."[215] Trooper Miller commented that the officers stopped between each taser cycle to evaluate the situation, "but in our situation where we were dealing with somebody who had a deadly weapon, you have to make decisions on the spur of the moment."[216] As Trooper Miller explained, Plaintiff "never quit fighting."[217]

**J.     Plaintiff is later hospitalized, where he resists treatment and purportedly tells the medical staff that he was involved in a race across Pennsylvania, which turned out to be a joke on him.**

Trooper Paul M. Mall, also of the Emporium Barracks was contacted at his residence by the dispatcher, police communications officer Locey, at approximately 3:40 that morning and asked him to proceed to the scene in the marked patrol car that was stationed at his residence.[218] When he arrived on scene, Trooper Mall observed Plaintiff handcuffed, moaning, and "grinding his

---

[214]   Trial Tr. at 50:02–04.

[215]   Farabaugh Dep. 39:10–11.

[216]   Miller Dep. 99:01–15.

[217]   Id. at 111:11.

[218]   ECF No. 36 Ex. 8 at 10.

forehead into the ground."[219] The three officers assisted Plaintiff onto his back "to make him stop hurting himself."[220] When emergency medical services arrived on scene, Trooper Mall observed the medics "ha[ving] a difficult time treating [Plaintiff]," because he "would not answer their questions and resisted their treatment attempts."[221]

Trooper Mall followed the ambulance to the Elk Regional Health Center in Ridgway, Elk County, Pennsylvania to maintain custody of Plaintiff. After Plaintiff arrived at Elk Regional, Trooper Mall recalls Plaintiff announcing that "he was involved in a race across Pennsylvania, which turned out to be a joke on him."[222] Doctors requested that Trooper Mall accompany Plaintiff to the radiology department so that x-rays could be performed.[223] Plaintiff purportedly stated that he "had enough," refused further x-rays, and was taken back to his unit in the emergency room.[224] Doctors ordered a CT scan (CAT scan) to be

---

[219] Id.

[220] Id.

[221] Id.

[222] Id.

[223] Id.

[224] Id.

performed on Plaintiff, which he refused, stating that he "complied with the other tests and wanted to be left alone."[225]

When the medical staff at Elk Regional ordered a series of IV fluids and a catheter, Plaintiff allegedly continued to refuse treatment and became "agitated and combative," pulling away from the staff as they attempted to treat him.[226] At that time, Trooper Mall requested a mental health specialist be sought to evaluate Plaintiff, which request was refused by a bedside nurse until Plaintiff was medically stable.[227] The attending staff informed Trooper Mall that he may need to secure Plaintiff so that he could receive the necessary treatment.[228]

At that time, a fellow state police officer, Trooper Allen Brothers, arrived at Elk Regional and was informed of the situation by Trooper Mall.[229] The attending staff informed the two officers that the IV fluid and catheter "were to be done for [Plaintiff]."[230] The two officers explained the situation to Plaintiff, informing him

---

[225] Id.

[226] Id.

[227] Id.

[228] Id.

[229] Id.

[230] Id.

that the treatment was critical and necessary to his health.[231] Plaintiff purportedly responded that "he did not want saline solution in his body."[232] When Plaintiff became increasingly agitated and began to repeatedly scream "Get out!" the two officers grabbed his wrists in an effort to secure him long enough for the procedures to be performed.[233] Trooper Mall reported that Plaintiff then attempted to bite Trooper Brothers and strike Troop Mall in the head with his knee.[234] Shortly thereafter, the two troopers were relieved of their duties at Elk Regional.[235]

While in the intensive care unit at the Elk County Regional Hospital, Plaintiff was guarded for a time by Corporal Martz, also of the Emporium Barracks.[236] On September 15, Corporal Martz spoke with Plaintiff's sixty-eight-year-old father who had arrived at the hospital.[237] Plaintiff's father explained that

---

[231] Id.

[232] Id.

[233] Id.

[234] Id.

[235] Id.

[236] ECF No. 36 Ex. 8 at 12.

[237] Id.

"his son had left the residence approximately 3 days prior."[238] It was Plaintiff's

father's opinion that his son "was not rational."[239] Plaintiff's father explained that

his son "believed that someone was impersonating his parents and himself."[240]

The Elk County Regional Hospital report indicated that Plaintiff suffered

from multiple generalized abrasions to his forehead, hands, and feet, acute renal

failure, and a breakdown of muscle tissue known as rhabdomyolysis.[241]The

report described Plaintiff as in mild to moderate distress and exhibiting restless

and anxious behavior.[242] Plaintiff also suggests that he "blacked out" after

approximately five deployments of the officer's tasers, a claim that appears to be

contradicted by the MVR and the officers' testimony.[243] Since the incident,

Plaintiff explains that he has experienced muscle spasms affecting his balance

and ability to walk, insomnia, fear when he hears crackling noises, generalized

---

[238]  Id.

[239]  Id.

[240]  Id.

[241]  ECF No. 45 Ex. 7 at 3–4.

[242]  Id. at 2.

[243]  Kircher Dep. 142:07–09.

pain in his left shoulder, suspected nerve damage, excessive sweating, persistent

renal issues, and diminished memory skills.[244]

### K.     The matter is presently before this Court on Defendants' timely objections to a report and recommendation granting in part and denying in part their motion for summary judgment.

On October 10, 2012, Plaintiff was tried in the Court of Common Pleas of

Cameron County for fleeing or attempting to elude police officers and resisting

arrest.[245] After reviewing the video recording and hearing testimony from both

Corporal Farabaugh and Plaintiff, the jury deliberated for approximately one

hour before returning a verdict of guilty on both counts.[246]

On August 13, 2013, Plaintiff filed a complaint against the Defendants

alleging that the Pennsylvania State Police failed to develop and enforce proper

policies regarding taser usage (Count I); that Farabaugh and Miller violated

Plaintiff's Fourth Amendment rights by using excessive force to effect his arrest

(Count II); that all Defendants are responsible for the failure to train as to

excessive force and taser usage (Count III); that Farabaugh and Miller violated

Plaintiff's right to be free from excessive force under Article I, § 8 of the

---

[244]   Id. at 51–52, 56 & Ex. 1.

[245]   Trial Tr. at 144.

[246]   Trial Tr. at 2, 137–44.

Pennsylvania Constitution (Count IV); and that Farabaugh and Miller assaulted and battered Plaintiff under Pennsylvania law (Count V).[247]

On November 17, 2014, Defendants filed a timely motion for summary judgment as to each count.[248] On December 29, 2015 Judge Arbuckle submitted a report and recommendation that granted in part and denied in part Defendants' motion for summary judgment.[249] Specifically, Judge Arbuckle granted summary judgment as to Counts I and III (the failure to train and policy void counts), which portions of the motion were unopposed by Plaintiff, but he also denied summary judgment as to Counts II, IV, and V (the federal and state excessive force and state assault and battery counts).[250] Defendants timely objected.[251] The primary arguments were briefed again in connection with my review of Judge Arbuckle's report and recommendation. This Court has jurisdiction over Plaintiff's constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and

---

[247]   ECF No. 1.

[248]   ECF No. 34.

[249]   ECF No. 57.

[250]   ECF No. 57.

[251]   ECF No. 62.

supplemental jurisdiction over his state law claims pursuant to 28 U.S.C.

§ 1367(a).

I now adopt in part and reject in part Judge Arbuckle's report and

recommendation. I will adopt those sections of his analysis that granted

summary judgment in favor of Defendants. However, I reject those sections of

Judge Arbuckle's analysis that denied the Defendants summary judgment. I will

also reject Judge Arbuckle's presentation of the facts, substituting for them the

Background section of this Memorandum.

In sum, there remain no genuine disputes of material fact as to Plaintiff's

claims. In light of the circumstances of the encounter, Defendants' conduct was

not unreasonable, and Defendants are immune for the actions they took in

effecting Plaintiff's arrest. Accordingly, Defendant's motion for summary

judgment is granted in full.

## II.    LAW

"One of the principal purposes of the summary judgment rule is to isolate

and dispose of factually unsupported claims or defenses, and we think it should

be interpreted in a way that allows it to accomplish this purpose."[252] Summary

---

[252] <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986).

judgment is appropriate where "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter

of law."[253]"Facts that could alter the outcome are 'material facts,' and disputes

are 'genuine' if evidence exists from which a rational person could conclude that

the position of the person with the burden of proof on the disputed issue is

correct."[254]

   "A defendant meets this standard when there is an absence of evidence

that rationally supports the plaintiff's case."[255] "A plaintiff, on the other hand,

must point to admissible evidence that would be sufficient to show all elements

of a prima facie case under applicable substantive law."[256]

   "[T]he inquiry involved in a ruling on a motion for summary judgment or

for a directed verdict necessarily implicates the substantive evidentiary standard

of proof that would apply at the trial on the merits."[257] Thus, "[i]f the defendant

---

[253] Fed. R. Civ. P. 56(a).

[254] Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) and Celotex Corp., 477 U.S. at 322).

[255] Clark v. Modern Grp. Ltd., 9 F.3d at 326.

[256] Id.

[257] Liberty Lobby, Inc., 477 U.S. at 252.

in a run-of-the-mill civil case moves for summary judgment or for a directed

verdict based on the lack of proof of a material fact, the judge must ask himself

not whether he thinks the evidence unmistakably favors one side or the other but

whether a fair-minded jury could return a verdict for the plaintiff on the

evidence presented."[258] "The mere existence of a scintilla of evidence in support

of the plaintiff's position will be insufficient; there must be evidence on which

the jury could reasonably find for the plaintiff."[259] "The judge's inquiry,

therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury

can properly proceed to find a verdict for the party producing it, upon whom the

onus of proof is imposed.'"[260]

"[A] party seeking summary judgment always bears the initial

responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which

it believes demonstrate the absence of a genuine issue of material fact."[261]

---

[258] Id.

[259] Id.

[260] Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson, 81 U.S. 442, 447 (1871)).

[261] Celotex Corp., 477 U.S. at 323 (internal quotations omitted).

"[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[262]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[263] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[264]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would

---

[262] Id.

[263] Liberty Lobby, Inc., 477 U.S. at 250.

[264] Fed. R. Civ. P. 56(c)(1).

contradict the facts identified by the movant.'"[265] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[266] On motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."[267]

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[268] "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[269] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[270]

---

[265] <u>Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[266] Fed. R. Civ. P. 56(e)(2).

[267] Fed. R. Civ. P. 56(c)(3).

[268] <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249.

[269] <u>Id.</u>

[270] <u>Id.</u> at 249–50 (internal citations omitted).

## III.   ANALYSIS

### A.   Defendants Are Entitled To Summary Judgment As To Plaintiff's Excessive Force Claims Because There Is No Genuine Dispute Of Material Fact That The Officers' Conduct Was Reasonable Under The Circumstances And That The Officers Nevertheless Enjoyed Qualified Immunity For Their Actions.

Granting Defendants' motion for summary judgment as to Plaintiff's excessive force claims is appropriate for two reasons. First, given Plaintiff's continued resistance, the officers' conduct was not unreasonable. Second, the officers are entitled to qualified immunity, since it would not have been clear beyond debate to every reasonable officer in Defendants' place that repeated deployment of their tasers in response to Plaintiff's resistance was excessive.

#### 1.   Given Plaintiff's continued resistance, the officers' conduct was not unreasonable under the circumstances.[271]

---

[271] The analysis in this subpart applies with full force and effect to Plaintiff's state constitutional claim. As both federal and state courts in Pennsylvania have recognized:

> Under the facts in this case, however, there is no evidence that the protection against the use of excessive force in Article I, Section 8, is broader than the Fourth Amendment. Because the same test would be applied here, to protect the same interest, under both Federal and State Constitutions, the protections are coextensive and Jones' right to be free from governmental use of excessive force is protected by the Federal Constitution as it would be under the Pennsylvania Constitution.

Taylor v. Moletsky, No. 07-4883, 2010 WL 299747, at *4 (E.D. Pa. Jan. 22, 2010) (quoting Jones v. City of Philadelphia, 890 A.2d 1188, 1216 (Pa. Commw. Ct. 2006)).

In <u>Brown v. Cwynar,</u> a leading 2012 decision on the use of tasers to subdue subjects who resist arrest, the United States Court of Appeals for the Third Circuit cited to the decision of the Supreme Court of the United States in <u>Garaham v. Connor</u> and set forth the applicable standard for disposing of excessive force claims:

> [A] plaintiff may prevail on an excessive force claim if he can show that a seizure occurred and that the seizure was unreasonable under the circumstances. In <u>Graham v. Connor</u>, the Supreme Court instructed that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' . . . requires . . . careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." The inquiry is an objective one. Additionally, reasonableness is to be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.[272]

The Third Circuit in <u>Brown</u> affirmed a district court's grant of summary judgment in a case involving multiple applications of a taser on a 73-year-old man who refused to cooperate with officers.[273] The elderly plaintiff in <u>Brown</u> purportedly became irate over a price discrepancy at his local Pearle Vision

---

[272] <u>Brown v. Cwynar</u>, 484 F. App'x 676, 679–80 (3d Cir. 2012) (Scirica, J.).

[273] <u>Id.</u> at 677.

eyewear store.[274] As the confrontation escalated, the plaintiff asked the

receptionist, "How would you like it if I spit in your face?" after which the

receptionist dialed 911.[275] When the first police officer arrived, the plaintiff was

leaving the eyewear shop, at which point employees yelled, "That's him! That's

him!"[276]

The officer followed plaintiff as he walked toward his vehicle, calling out

for him to stop multiple times and explaining that he was dispatched to

investigate a disturbance in the eyewear shop.[277] The officer informed plaintiff

that he just had a few questions for him.[278] Plaintiff continued walking toward

his car and responded, "I don't have to do what you say. I don't have to talk to

you."[279] Plaintiff opened his driver's side door and got into his car, at which

point the officer asked him to lower the window and give him the keys.[280] The

officer informed the plaintiff that he was not free to leave, but like the Plaintiff in

---

[274] Id.

[275] Id. at 678.

[276] Id.

[277] Id.

[278] Id.

[279] Id.

[280] Id.

the instant matter, the plaintiff in <u>Brown</u> "refused to comply and reached for the gear shift."[281]

The officer warned the plaintiff that he would tase him if he did not cooperate.[282] Still, Plaintiff continued to struggle.[283] As a consequence, the officer deployed the taser twice into the plaintiff's left tricep.[284] These initial two deployments of the taser did not succeed in subduing the plaintiff, as he continued to resist and refused to hand over his keys.[285] At that point, a backup officer from the Pennsylvania State Police had arrived as the plaintiff and the first officer continued to struggle in the front seat of the car.[286] The state police officer described plaintiff's as "thrashing about in the car, kicking out of control, and refusing to respond to [the first officer's] commands."[287] The state police officer unsuccessfully attempted to obtain the car keys or pull the plaintiff from the vehicle.[288]

---

[281] <u>Id.</u>

[282] <u>Id.</u>

[283] <u>Id.</u>

[284] <u>Id.</u>

[285] <u>Id.</u>

[286] <u>Id.</u>

[287] <u>Id.</u>

[288] <u>Id.</u>

Afterward, a third officer arrived on scene, having received two calls from the emergency dispatch center regarding the instant altercation.[289] As he approached the vehicle, the third officer saw the plaintiff on the ground, lying on top of both his hands.[290] The first two officers explained that they were trying to arrest the plaintiff, that he had already been tased, and that he continued to act unruly.[291] The officers stood around the plaintiff and instructed him to release his hands.[292] The third officer warned the plaintiff that if he did not comply, he would be tased again.[293] Like the Plaintiff in the instant matter, the plaintiff in Brown, "despite multiple warnings, [ ] refused to release his hands."[294] The third officer thereafter deployed the taser in drive stun mode to plaintiff's upper back. Plaintiff's hands unclenched, and he was placed under arrest.[295]

In Brown, the Third Circuit panel comprised of the Honorable Anthony J. Scirica, the Honorable Thomas L. Ambro, and the Honorable D. Brooks Smith held that summary judgment in favor of the defendant police officer was

---

[289] Id.
[290] Id.
[291] Id.
[292] Id.
[293] Id.
[294] Id.
[295] Id.

appropriate for two reasons. "First, the evidence considered in the light most

favorable to [plaintiff] shows 'no genuine dispute as to any material fact'

regarding whether [defendant] used excessive force. The evidence shows the

force he deployed was proportionate and reasonable."[296] "Second, . . .

[defendant] is entitled to qualified immunity."[297]

By the time the district court entered its grant of summary judgment, the

only remaining defendant was the third officer to arrive on scene.[298] According to

the court, at the time the third officer fired his taser, he had the benefit of the

following pieces of information: (1) police dispatch calls regarding a developing

incident; (2) firsthand observation of the scuffle; (3) knowledge that the plaintiff

was previously tased but still acted uncooperatively; and (4) firsthand

observation of the plaintiff's continued refusal to cooperate.[299] That information

alone was sufficient for the Third Circuit to affirm the district court's grant of

summary judgment on the excessive force claim. "Together, this information

supplied [defendant] a reasonable basis to conclude that Brown would continue

---

[296] Id. at 679.

[297] Id.

[298] Id.

[299] Id. at 680.

to resist arrest and to act belligerently towards the police were he not

subdued."[300] "Moreover," the court noted, "[the officer] personally warned [the

plaintiff] he would be tased if he did not release his hands, and [the plaintiff] was

undeterred."[301]

I consider the facts of the instant matter as indicating even more strongly

than in Brown that an outright grant of summary judgment on Plaintiff's

excessive force claim is the appropriate disposition. The basic factors delineated

by the Third Circuit in Brown as to personal observation of the confrontation and

firsthand knowledge of a developing situation are clearly met here. What's more,

the MVR indisputably shows that while the officers were standing against his

car, Plaintiff continued to press the gas pedal and rev his engine, lurching his

vehicle forward even after the first few taser deployments.[302] The threat to the

---

[300]  Id.

[301]  Id.

[302]  In Scott v. Harris, the late Justice Antonin Scalia, writing for the Supreme Court of
the United States, reversed the denial of summary judgment motion filed by a police
officer defendant in an excessive force claim. The plaintiff in Scott was a vehicular
pursuit subject who was rendered quadriplegic after an officer rammed his vehicle
to end a pursuit. Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 167 L. Ed. 2d 686
(2007). The case is important for our purposes in two respects. First, as it relates to
the MVR, it stands for the proposition that "[w]hen opposing parties tell two
different stories, one of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that version of the facts for

safety of the officers' as well as to any oncoming motorists was therefore arguably greater here than in <u>Brown</u>.

Although not pictured directly on the MVR, that Plaintiff in this case did not comply with the officers' orders even after the initial deployments of their tasers is not genuinely disputed. Plaintiff admits that he kept his hands on the wheels and did not exit the car, even when the officers instructed him to do so. According to Plaintiff, he removed his hands periodically solely to shield himself. The MVR also clearly preserved Plaintiff shouting "What did I do?" and "Get off me!" at several points throughout the continued struggle. Moreover, the officers both testified consistently as to Plaintiff's attempts to block them from reaching the keys in hopes of disabling the vehicle, as well as Plaintiff's continued flailing and kicking the officers.

---

purposes of ruling on a motion for summary judgment." <u>Id.</u> at 380. Justice Scalia observed, for instance, that "[f]ar from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." <u>Id.</u> at 380. Second, substantively, it makes clear that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." <u>Id.</u> at 386. Although the speed of the pursuit involved in the instant case was admittedly not as great as that witnessed in <u>Scott</u>, I nonetheless consider the potential danger faced by the responding officers and any oncoming traffic to be quite similar in character and immediacy.

Perhaps an even more compelling justification for the officers' actions here comes not from what was known by them but from what was unknown. Plaintiff's odd manner of driving would give rise to a number of potentially nefarious explanations in any reasonable officer's mind. Despite their previous, brief encounter with Plaintiff, the officers here had no knowledge as to whether any weapons were on his person or secreted in his vehicle's compartments. At one point, in fact, the officers observed Plaintiff reaching for his pants pocket in a way that objectively suggested to them he might be attempting to pull out a weapon.

Considering the circumstances as they existed at the time, I do not believe that a reasonable jury could find that the officers here behaved excessively. Instead, I believe that they did everything they could to diffuse the situation, take the subject under control, and ensure the safety of themselves and others without resorting to deadly force. That is the case even though the officers feared for their own lives as Plaintiff continued to struggle with them.

Much has been made in Plaintiff's papers as to the number of times the officers deployed their tasers. While I appreciate the skepticism one might express when the number seventeen is initially noted, my judgment is that the

circumstances of the incident, particularly the continued resistance on Plaintiff's

part, rendered such force reasonable and not excessive. Not only does the

evidence suggest that fewer than seventeen deployments actually made contact

with Plaintiff's person, but the testimony also shows that, based upon the

officers' firsthand observations, the initial deployments of their tasers had little

to no effect on Plaintiff. That is a curiously common feature of this case as well as

those others that I review throughout this section. What's more, the tasers were

deployed for a total of approximately one minute and twenty-three seconds over

the course of the approximately eight minutes and fourteen seconds that the

struggle ensued, making this a much different case than one involving

substantial taser applications allocated across a much shorter timeframe.

Plaintiff also cites to R. Paul McCauley, Ph.D., FACFE, a Professor

Emeritus of Criminology and former Chairman of the Department of

Criminology at Indiana University of Pennsylvania, who has authored an expert

opinion in this case.[303] Dr. McCauley points out several facets of the officers'

approach with which he disagrees, including lack of verbal warnings and

---

[303] ECF No. 45 Ex. 1

coordination between the two officers.[304] Dr. McCauley also contends that the

taser deployment patterns violated governmental policies concerning accepted

usage of such devices.[305] Respectfully, I have considered Dr. McCauley's opinion,

but in a case such as this, the particularized circumstances of the incident, as

experienced in realtime by the officers and the subject, necessarily trump

academic second-guessing. "Not every push or shove, even if it may later seem

unnecessary in the peace of the judge's chambers, violates . . . constitutional

rights."[306]

Turning to a similar case, the United States District Court for the District of

Delaware granted summary judgment in favor of police officer defendants in a

case where the plaintiff had resisted arrest. In <u>Yarnall v. Mendez</u>, the plaintiff

had been handcuffed, and police had already conducted a warrant check on his

identification.[307] The police officers, however, believed that the plaintiff was

"high on some drug like ecstasy or PCP," because he appeared "highly agitated

---

[304]   <u>Id.</u> <u>See also</u> ECF No. 69 at 15.

[305]   ECF No. 45 Ex. 1. <u>See also</u> ECF No. 69 at 15.

[306]   <u>Ostrander v. Horn</u>, 145 F. Supp. 2d 614, 618 (M.D. Pa. 2001) (Mannion, Mag. J.), <u>aff'd</u>, 49 F. App'x 391 (3d Cir. 2002).

[307]   <u>Yarnall v. Mendez</u>, 509 F. Supp. 2d 421, 425 (D. Del. 2007).

and incoherent."[308] Shortly after being placed in handcuffs, the plaintiff began

walking away from the arresting officer.[309] The officer chased the plaintiff,

striking him in the head with his flashlight at least twice.[310]

Plaintiff was incapacitated long enough to be dragged back to and bent

over the hood of the police car, where he continued to resist arrest.[311] The police

officer deployed his taser into plaintiff's back, and plaintiff fell to the ground.[312]

The officer told the plaintiff to lie on his stomach or he would "get it again."[313] At

that point, the officer deployed the taser again.[314] Nevertheless, the plaintiff

"stood up and began running" toward a busy street.[315] The officer pursued him

and tasered him again in probe mode.[316] Plaintiff could be heard "yelling in

---

[308] <u>Id.</u>

[309] <u>Id.</u>

[310] <u>Id.</u> at 426.

[311] <u>Id.</u>

[312] <u>Id.</u>

[313] <u>Id.</u>

[314] <u>Id.</u>

[315] <u>Id.</u>

[316] <u>Id.</u>

pain."[317] Still struggling with his arms and legs, the plaintiff was once again tased by another officer, this time directly in the back.[318]

On the particular issue of continued deployment of a taser against a subject who is resisting arrest, the court granted summary judgment for the defendants. Of particular weight was the police officer's video recording of the incident. "The videotape clearly shows plaintiff running from the police and, while being pursued, at some point in time yelling in pain after he is tasered."[319] The court noticed the fact that the plaintiff in <u>Yarnall</u>, like the Plaintiff here, explained that he ran "because he was scared for his life."[320]

That explanation was discounted in short order, the court noting that no matter the subject's justification, "he ran from law enforcement."[321] Consequently, a reasonable observer could conclude that repeated deployment of the officers' tasers "was required to gain compliance from plaintiff."[322] Accordingly, "[e]ven when viewing the facts in the light most favorable to

---

[317] <u>Id.</u>

[318] <u>Id.</u>

[319] <u>Id.</u> at 432–33.

[320] <u>Id.</u>

[321] <u>Id.</u> at 433.

[322] <u>See</u> <u>id.</u>

plaintiff, it is undisputed that, after his arrest, he ran from officers and resisted; it was reasonable and necessary for the officers to use force to gain control of the situation."[323]

I also find instructive the decision by the Honorable Terrence F. McVerry of the United States District Court for the Western District of Pennsylvania in Wargo v. Municipality of Monroeville, Pennsylvania. The Wargo case also involved a grant of summary judgment in favor of defendant officers named in an excessive force claim.[324] The facts of Wargo mirror those of the instant dispute in several respects. Specifically, the Plaintiff in Wargo was a mentally ill individual who, under the pressure of a failing business and an impending foreclosure, ran into the woods and texted his wife that "If I would kill myself, you can file a wrongful death suit. Do not fight what's coming because every end has a new beginning."[325] By his own admission, the plaintiff in Wargo was "very upset" and experienced "irrational thoughts."[326]

---

[323]  Id.

[324]  646 F. Supp. 2d 777, 787 (W.D. Pa. 2009).

[325]  Id. at 780.

[326]  Id.

When the officers called to the scene confronted the plaintiff in the darkened woods, they shined a flashlight on him, telling him to take his hands out of his packets and lie on the ground.[327] The officers also observed a firearm in plaintiff's jacket pocket.[328] Instead, the plaintiff shouted, "get the fucking flashlight out of my face and leave this property."[329] The officers were "absolutely afraid" of plaintiff as they approached him.[330]

At that point, the officers deployed a taser on plaintiff for the first time, sending probes into his throat and chest.[331] Despite having been hit with the taser, plaintiff remained standing and did not comply with the officer's commands.[332] In response, one officer continued to tase plaintiff four additional times.[333] That officer's taser log indicated five total deployments over a period of

---

[327] Id. at 781.

[328] Id.

[329] Id.

[330] Id.

[331] Id.

[332] Id.

[333] Id. at 782.

32 seconds.[334] At that point, another officer arrived on scene and, upon observing

plaintiff still standing, also deployed his taser into plaintiff's back.[335]

Plaintiff then fell to the ground, where the officers pinned his wrists with

their boots and instructed him to turn over, lie on his stomach, and put his hands

at his sides.[336] Plaintiff still did not comply but responded, "fuck you."[337] After

which instruction, plaintiff was again tasered by the officers in the back.[338]

Officers were then able to handcuff and subdue the plaintiff.[339]

As to plaintiff's excessive force claim, Judge McVerry granted summary

judgment in favor of the defendant officers, explaining that "no reasonable jury

could conclude that the use . . . of their tasers on [plaintiff] constituted an

excessive use of force."[340] "In some circumstances," the court reasoned, "the use

of a taser by law enforcement could be excessive," but "[t]his is not such a

---

[334] Id.

[335] Id.

[336] Id.

[337] Id.

[338] Id.

[339] Id.

[340] Id. at 787.

case."[341] "[The officer] was confronted with an armed, belligerent man who refused to comply with orders to stop his approach, drop his gun, and lie down on the ground, and thus reasonably employed his taser to subdue the suspect."[342]

The court further explained that plaintiff's continued resistance validated subsequent deployments of the officers' tasers. "Because [plaintiff] still had not complied with [the officer's] orders and posed a potential threat if not restrained, [the officer's] continued discharges of his taser were likewise reasonable."[343] Notably, the court reasoned that "[t]his would be true regardless of whether [plaintiff] was in direct possession of his firearm."[344] Accordingly, "because all previous attempts to control [plaintiff] were unsuccessful, and given [the second officer's] reasonable belief that [plaintiff] was still armed, a reasonable jury could not conclude that his use of taser force was excessive."[345]

Nearly the exact narrative and explication as Judge McVerry's could be written about the incident in this case. First, both plaintiffs were armed with

---

[341] Id.

[342] Id.

[343] Id.

[344] Id. at 787–88.

[345] Id. at 788.

deadly weapons, and the officers in the present action had the added

disadvantage of not knowing what potential weapons lurked in Plaintiff's

vehicle. Arguably, Plaintiff's revving of the engine and lurching his car forward

indicates an even greater capacity to use deadly force than was observed in

Wargo. Also, the Wargo and Yarnall cases demonstrate that the suspected crime

in the reasonable force analysis need not be extreme but may be an offense as

basic as fleeing and eluding police. The cases also prioritize the officers' objective

perceptions over the suspect's unascertainable mental state or subjective intent.

Thus, in light of these considerations and also given Trooper Miller's explanation

that a few of the deployments hit him instead of Plaintiff, I am unconvinced that

there is a material distinction between the reasonableness of the deployments

carried out in Wargo and Yarnall and those used here against Plaintiff.

Moreover, the most striking similarity is that of the repeated refusals by

the subject in each of these cases to obey lawful commands and yield to the

officers' authority. Importantly, Judge McVerry made clear that summary

judgment was appropriate even if such refusal was the claimed result of

plaintiff's body having "tensed up" so that "he could not move" and even if the

plaintiff "was able to verbally respond that he could not comply with [the

officer's] instructions to lie down."[346] "Methods employed by law enforcement that may seem extreme with the benefit of hindsight are not <u>per se</u> constitutional violations, even if they caused discomfort to a plaintiff," Judge McVerry explained.[347] "Even if a plaintiff is not armed, it is reasonable for law enforcement to employ multiple rounds of non-lethal force if necessary to effectuate an arrest."[348] Judge McVerry explained the resistance issue as follows in <u>Wargo</u>:

> In this case, due to [plaintiff's] combative nature, prior refusal to disarm, and suicidal state, combined with the previous ineffectiveness of [the officer's] taser, it was objectively reasonable for [the second officer] to conclude that [plaintiff] still posed a threat and thus further action on his part was necessary in order to subdue the suspect, armed or not. Once [the officer] had already deployed his taser, it was the most logical course of action to continue to use it, as opposed to utilizing another form of non-lethal force. In light of these factors, a jury would not categorize [the officer's] use of force as excessive based upon the applicable standards of reasonableness.[349]

As a matter of law, the Judge McVerry concluded that even the final two taser deployments fired by the second officer were not unreasonably excessive. "Upon arriving at the scene, [the second officer] reasonably believed that he was

---

[346] <u>Id.</u> at 781.

[347] <u>Id.</u> at 784–85.

[348] <u>Id.</u> at 786.

[349] <u>Id.</u> at 786–87.

confronted with an armed, previously belligerent suspect who had yet to be subdued," the court explained.[350] Even if the plaintiff in actuality was not armed, Judge McVerry explained as to objective reasonableness that the critical question was whether the second officer "reasonably believed that [plaintiff] still was armed."[351] "As such, it would not be deemed unreasonable for [the second officer] to have used his taser a second time when [plaintiff] mounted his last act of resistance by refusing to assume a position that allowed for his arrest."[352] "Force reasonably necessary to effectuate an arrest does not represent an inherent Constitutional violation," the court concluded.[353]

In conclusion, taking into account the severity of the crime at issue, the immediate threat to the safety of the officers that Plaintiff posed, and Plaintiff's actively resisting arrest and attempting to evade arrest by flight using his vehicle, I hold that the officers' conduct was not unreasonable under the Consitution.

---

[350] Id. at 787.

[351] Id.

[352] Id.

[353] Id.

2.      In addition, the Defendants are entitled to qualified immunity, because every reasonable official in the defendant's shoes would not have understood beyond debate that tasering Plaintiff constituted excessive force.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[354] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[355]

"The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."[356] However, "qualified immunity is inapplicable to a state law cause of action."[357] Thus, as should be noted for our

---

[354]  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).

[355]  Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

[356]  Id. (internal quotation marks omitted).

[357]  Miller v. New Jersey, 144 F. App'x 926, 929 (3d Cir. 2005).

purposes here, "[a] qualified immunity analysis does not apply to a pendent state claim."[358]

"Decision of this purely legal question permits courts to expeditiously weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits."[359] "One of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."[360]

"Indeed," the Supreme Court of the United States has "made clear that the 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery."[361] "Accordingly, we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."[362]

---

[358] Id.

[359] Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 1793, 114 L. Ed. 2d 277 (1991).

[360] Id.

[361] Pearson, 555 U.S. at 231 (second internal quotation marks omitted).

[362] Id. at 232 (internal quotation marks omitted).

In <u>Saucier v. Katz</u>, the Supreme Court established a two-step process for resolving claims of qualified immunity: "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."[363] "For the official to have 'fair warning' that his or her actions violate a person's rights, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[364]

"This two-step procedure, the <u>Saucier</u> Court reasoned, is necessary to support the Constitution's elaboration from case to case and to prevent constitutional stagnation."[365] "The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."[366]

---

[363] <u>Pearson</u>, 555 U.S. at 232 (citing <u>Saucier v. Katz</u>, 534 U.S. 194, 201 (2001)).

[364] <u>Burns v. PA Dep't of Corr.</u>, 642 F.3d 163, 176 (3d Cir. 2011) (internal quotation marks and citations omitted).

[365] <u>Pearson</u>, 555 U.S. at 232 (quoting <u>Saucier</u>, 533 U.S. at 201).

[366] <u>Pearson</u>, 555 U.S. at 232 (quoting <u>Saucier</u>, 533 U.S. at 201).

In <u>Pearson v. Callahan</u>, Justice Samuel A. Alito, Jr., writing for the

Supreme Court, explained that "while the sequence set forth [in <u>Saucier</u>] is often

appropriate, it should no longer be regarded as mandatory."[367] "The judges of

the district courts and the courts of appeals should be permitted to exercise their

sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular

case at hand."[368]

Pertinently, in <u>Mullenix v. Luna</u>, a November 2015 decision, the Supreme

Court emphasized as follows:

> We have repeatedly told courts . . . not to define clearly established
> law at a high level of generality. The dispositive question is whether
> the violative nature of <u>particular</u> conduct is clearly established. This
> inquiry must be undertaken in light of the specific context of the
> case, not as a broad general proposition. Such specificity is
> especially important in the Fourth Amendment context, where the
> Court has recognized that it is sometimes difficult for an officer to
> determine how the relevant legal doctrine, here excessive force, will
> apply to the factual situation the officer confronts.[369]

I find it quite evident that the officers here enjoy qualified immunity for

the actions they took to effect Plaintiff's arrest. As the Third Circuit in <u>Brown</u>

---

[367] 555 U.S. at 236.

[368] <u>Id.</u>

[369] 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (internal citations and quotation marks
omitted).

explained, qualified immunity in a taser deployment case such as this one should attach "because not every reasonable official in [the defendant's] shoes would have understood beyond debate that tasering [the subject] constituted excessive force."[370] It explained that "multiple courts of appeals had approved of the use of taser guns to subdue individuals who resist arrest or refuse to comply with police orders and provided the following string citation listing examples of such approval by the circuit courts:

> See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir.2004) (holding the use of a taser to "effectuate [an] arrest" was reasonable when the individual was "hostile, belligerent, and uncooperative"); Hinton v. City of Elwood, 997 F.2d 774, 781 (10th Cir.1993) (approving the use a stun gun to overcome a suspect's resistance of arrest); Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir.1992) (holding it was reasonable to use a taser to subdue a paranoid schizophrenic who locked himself in an apartment and disobeyed police orders to open the door and drop his weapons); cf. Giles v. Kearney, 571 F.3d 318, 329 (3d Cir.2009) (holding the use of a capstun was "proportionate" when a prison inmate "repeatedly refus[ed] to obey orders"). Meanwhile, no decision by the Supreme Court, this Circuit, or by a majority of other federal circuits had foreclosed the use of taser guns when suspects resist arrest in an aggressive and combative manner. See Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir.2012) (holding qualified immunity attached when, in 2007, an officer tased a man

---

[370] Brown v. Cwynar, 484 F. App'x 676, 681 (3d Cir. 2012) (internal quotation marks omitted).

who resisted arrest by crawling and thrashing because "no
precedent . . . ha[d] staked out a bright line").[371]

Accordingly, the Third Circuit concluded that "[a] reasonable officer in

[defendant's] shoes at the time in question would not have perceived federal law

to preclude deploying a taser to effectuate [plaintiff's] arrest.[372]

Similarly, as the United States Court of Appeals for the Sixth Circuit has

recently commented in a comprehensive taser usage decision, "in no case where

courts denied qualified immunity was the plaintiff fleeing, and in at least some of

these cases, the court specifically referred to the fact of non-flight. . . . By contrast,

in all cases where a plaintiff fled from police, the court held that qualified

immunity was appropriate, and some courts referred specifically to the plaintiff's

flight."[373]

In light of these authorities, I conclude that a reasonable officer in

Defendants' position, having been confronted with the same scenario Defendants

faced that night, would not have understood beyond debate that the manner in

which they deployed their tasers was excessive, even assuming for the sake of

argument that it was. Plaintiff points to no decision, test, metric, principle, or

---

[371] <u>Brown</u>, 484 F. App'x at 681.

[372] <u>Id.</u>

[373] <u>Cockrell v. City of Cincinnati</u>, 468 F. App'x 491, 496–97 (6th Cir. 2012).

common sense determination that rendered the officers' conduct here excessive

as a matter of law. Because the officers did not violate clearly established rules,

they did not forfeit their immunity. Thus, in accordance with the foregoing

analysis, summary judgment should be granted in favor of Defendants as to

Plaintiff's excessive force claim for this second, independent reason.

**B.    Defendants Are Entitled To Summary Judgment As To Plaintiff's State Law Claims, Both As A Matter Of Substantive Law And Because The Officers Were Shielded By Sovereign Immunity.**

As the United States District Court for the Eastern District of Pennsylvania

has explained, in cases involving both federal excessive force and related

Pennsylvania tort claims arising out of an attempted arrest, whether the officers

used constitutionally excessive force is often dispositive of the related state

claims, like assault and battery. The court wrote:

> Under Pennsylvania law, an assault occurs when one acts with the intent to put another in reasonable and immediate apprehension of a harmful or offensive contact, and that act does cause such apprehension. A battery occurs whenever the violence menaced in an assault is actually done, though in ever so small degree, upon the person. In making a lawful arrest, police officers are permitted to use such force as is necessary under the circumstances to effectuate the arrest. <u>The reasonableness of the force used in making the arrest</u>

determines whether the police officer's conduct constitutes an assault.[374]

Consequently, and in light of my determination in Part III.A.1 that the officers' conduct here was reasonable in light of the circumstances, it follows logically that, as a matter of Pennsylvania substantive law, the officers did not assault or batter the Plaintiff during the altercation. Thus, as a threshold matter, I conclude that there is no genuine dispute of material fact that Plaintiff has failed to prove the elements of his assault and battery claims. Were courts to hold otherwise, we would open a loophole whereby unsuccessful excessive force claims, which truly formed the crux of an action, would be permitted to survive under the guise of state law analogs.

Moreover, for the independent reason that the officers enjoyed sovereign immunity as to Plaintiff's state law claims, summary judgment should also be granted in favor of Defendants as to those counts. "It is well-established under Pennsylvania law that the Commonwealth enjoys immunity from suit except when the General Assembly has, by statute, expressly waived the immunity."[375]

---

[374] Reiff v. Marks, No. 08-CV-5963, 2011 WL 666139, at *7 (E.D. Pa. Feb. 23, 2011).

[375] Urella v. Pennsylvania State Troopers Ass'n, 628 F. Supp. 2d 600, 605–06 (E.D. Pa. 2008) (DuBois, J.).

"The Pennsylvania legislature has waived sovereign immunity in only nine limited circumstances: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines."[376] "Each of these exceptions is to be strictly construed."[377] Plaintiff's claims against Defendants here do not fall among any of these legislated exceptions.

"[A]n employee of the Commonwealth . . . acting within the scope of his or her employment or duties, is protected by sovereign immunity from the imposition of liability for intentional tort claims."[378] "Under Pennsylvania law, an action falls within the scope of employment if it: (1) is the kind that the employee is employed to perform; (2) occurs substantially within the job's authorized time and space limits; (3) is motivated at least in part by a desire to serve the employer; and (4) if force was used by the employee against another, the use of

---

[376] Id. (citing 42 Pa.C.S.A. § 8522(b)).

[377] Urella, 628 F. Supp. 2d at 606.

[378] Mitchell v. Luckenbill, 680 F. Supp. 2d 672, 682 (M.D. Pa. 2010) (Vanaskie, J.) (quoting Holt v. Nw. Pennsylvania Training P'ship Consortium, Inc., 694 A.2d 1134, 1139 (Pa.Cmmwlth.Ct.1997)).

force is not unexpectable by the employer."[379] "Even willful misconduct does not

vitiate a Commonwealth employee's immunity if the employee is acting within

the scope of his employment, including intentional acts which cause emotional

distress."[380]

"An act of a servant is not within the scope of employment if it is done

with no intention to perform it as a part of or incident to a service on account of

which he is employed."[381] "[E]ven unauthorized acts may be within the scope of

employment if they are clearly incidental to the master's business."[382]

Moreover, in determining whether "force is not unexpectable by the

employer," courts have commented that "[a]n act is unexpectable by the master

when it is done in a whimsical or outrageous manner."[383] For instance, "an

assault committed by an employee upon another for personal reasons or in an

---

[379] Mitchell, 680 F. Supp. 2d at 682.

[380] Cooper v. Beard, No. CIV.A. 06-0171, 2006 WL 3208783, at *16 (E.D. Pa. Nov. 2, 2006).

[381] Stekovich v. United States, 102 F. Supp. 925, 926 (M.D. Pa. 1952) (Follmer, J.).

[382] Brumfield v. Sanders, 232 F.3d 376, 381 (3d Cir. 2000) (Rosenn, J.) (internal quotation marks omitted).

[383] Haas v. Barto, 829 F. Supp. 729, 734 (M.D. Pa. 1993) (McClure, J.), aff'd sub nom Haas v. United States, 27 F.3d 557 (3d Cir. 1994).

outrageous manner, which is not actuated by an intent to perform the business of

the employer . . . is not within the scope of employment."[384]

The allegations of Plaintiff's complaint contradict the argument that the

individual Defendants acted beyond the scope of their employment with the

state police. For instance, Plaintiff charges that:

> 3.   Defendant Trooper Eric Farabough [sic] is an adult
> individual who at all times relevant was employed by
> Defendant State Police Department as a trooper. He is
> sued in his official and individual capacities.
>
> 4.   Defendant Trooper Dennis Miller is an adult individual
> who at all times relevant was employed by Defendant
> State Police Department as a trooper. He is sued in his
> official and individual capacities.
>
> 5.   At all times relevant, Troopers Farabough [sic] and
> Miller acted under color of state law, and were acting as
> the agents, representatives and/or employees of
> Defendant Pennsylvania State Police Department.[385]

In La Frankie v. Mikilch, the Commonwealth Court of Pennsylvania

confronted this exact issue and held that a state trooper was entitled to sovereign

immunity as against any intentional tort claims because he acted within the

scope of his employment "when he investigated the crimes and arrested [the

---

[384]  Leone v. Towanda Borough, No. CIV.A. 3:12-0429, 2012 WL 2590387, at *7 (M.D. Pa.
July 3, 2012) (Caputo, J.).

[385]  ECF No. 1 at 2 ¶¶3–5.

plaintiff]."[386] The court in La Frankie specifically noted that the plaintiff had

"admitted in paragraph 9 of the complaint that '[a]t all times hereinafter

mentioned and relevant hereto, [defendants] were acting as the agents, servants

and employees of Defendant Commonwealth, and within the scope of their

employment.'"[387] The Commonwealth Court thereby affirmed an entry of

judgment notwithstanding the verdict in favor of the defendant officer.[388]

Again, in Mitchell v. Luckenbill, then District Judge Thomas I. Vanaskie,

writing for this Court, granted summary judgment in favor of defendant state

police officers as to state law claims alleging that the officers used excessive force

when they entered a home during the middle of the night to question a family

member about a recent hit-and-run.[389] When the suspect would not come to the

door, the officers entered the home, engaged in a fistfight with the subject,

applied pepper spray to his face, secured him with handcuffs, threw his wife

---

[386] La Frankie v. Miklich, 152 Pa. Cmwlth. 163, 171, 618 A.2d 1145, 1149 (1992).

[387] Id. at 171–72.

[388] Id.

[389] 680 F. Supp. 2d 672, 677 (M.D. Pa. 2010).

down onto a loveseat, and engaged in other physical contact with the suspect's

daughters.[390]

Judge Vanaskie clarified that "[e]ven where a plaintiff asks for monetary

damages against a defendant in his individual capacities, sovereign immunity

applies."[391] Analyzing the sovereign immunity issue, Judge Vanaskie concluded

that "[p]laintiffs' argument that the officers were acting outside the scope of their

authority is without merit."[392] Reiterating the key factors, the court wrote that,

like the officers in the present case, "[t]he actions taken by [d]efendants were

actions that were taken in their capacity as state troopers and not as private

individuals. Defendants were on duty, in uniform, and investigating a crime

throughout the duration of the alleged offenses."[393] "Because the record clearly

supports the conclusion that the [d]efendants were acting within the scope of

their employment when the acts were allegedly committed, they are immune

---

[390] Id. at 679–680.

[391] Id. at 682.

[392] Id. at 683.

[393] Id.

from liability on state law causes of action, and [p]laintiffs' common law claims will be dismissed."[394]

Although this Court is cognizant of authority holding that the scope of employment determination is typically a factual one reserved for the jury's determination, where the appropriate resolution of that issue is readily apparent from the evidence, disposition on the grounds of immunity should not be delayed. Rather, the motivating force behind grants of immunity to government entities and their employees is to free them from litigating over actions taken and decisions made to carry out effective governance. The Supreme Court explained the origin of sovereign immunity in <u>Alden v. Maine</u> as follows:

> [A]s the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States).[395]

Thus, in accordance with the foregoing, I also hold that the Defendants are entitled to sovereign immunity as to Plaintiff's state law claims because there is no genuine dispute of material fact that they acted within the scope of their

---

[394] <u>Id.</u>

[395] <u>Alden v. Maine</u>, 527 U.S. 706, 713, 119 S. Ct. 2240, 2246–47, 144 L. Ed. 2d 636 (1999) (Kennedy, J.).

employment at all times during the encounter in question. The officers were in uniform, on duty, responding to a state police dispatch, using state police issued vehicles and equipment, and most importantly, conducting themselves in a manner to serve one end: effecting the arrest of a fleeing and potentially dangerous subject, perhaps the primary role of any on-duty officer when confronted with suspected illegality. A certain amount of physical force may attend such an arrest. That is the nature of the job. However, use of reasonable force to effect a lawful arrest does not strip away from the officers the immunity that they enjoy as agents of the Commonwealth, when performing the Commonwealth's work. For these reasons, Defendants' motion for summary judgment will also be granted as to Plaintiff's state law claims for this second, independent reason.

## IV.   CONCLUSION

When a police officer pursues a vehicle that has been traveling in the dark with its lights off, that weaves across lanes at suspiciously slow speeds, and that is operated by a subject who fails to obey lawful commands, the precise profile of that motorist has infinitely many iterations—some, admittedly, more likely than others. Perhaps the driver is intoxicated and clumsily attempting to flee the

flashing lights that have appeared in his rearview mirror. Or the driver might be a dangerous fugitive, readying a deadly weapon and plotting a furtive escape. Maybe an elderly individual is behind the wheel, having experienced difficulty recollecting the usual path home. And sometimes, the driver will turn out to be an individual reluctant to stop because he suffers from mental illness.

The reality is, however, the circumstances do not permit—and the law does not require—that pursuing officers correctly deduce the motorist's identity, subjective intent, or individualized circumstances before employing an objective quantum of force that the situation reasonably permits. Quite the opposite, the attendant risks to health and safety render hesitation for some academic notion of scientific certainty impracticable.

In addition, when one examines the lengthy narrative of this case, there can be no doubt that the circumstances of Plaintiff's life, intermingled with the perfect storm of stressors he experienced during the night in question, led to a painful and perhaps eerily predictable ending. Some might ask: How should driving privileges for someone like Plaintiff who suffers from mental illness be handled? Should he be permanently restrained from driving or engaging in similar activities by law or by a caregiver?  While most recognize that proposal

draconian and unworkable, it is rather uncontroversial that both tort and

criminal law appear to have few qualms placing those burdens on such

individuals and their families.

The truly unfortunate aspect of this case, then, is that the decisions

previously made by Plaintiff and his family, do tend to resemble a kind of

minimization of Plaintiff's mental issues and may have foreclosed any alternative

courses of action. Consider, for instance, a service that enabled drivers to link

pertinent medical conditions—heart issues, vision problems, mental illnesses,

etc.—to their license plate or driver identification number. When the officers ran

Plaintiff's plate number and biographical data, perhaps they could have been

more informed. Another version of such a program could involve decals placed

on the afflicted's vehicle or an identification card displayed on a lanyard, in a

wallet, or worn as a medical alert bracelet. Perhaps Plaintiff should have just

been more forthright about his condition with counselors, doctors, and others, so

that he might have received the regimented treatment he needed.

What the background of this story suggests to me, however, is that

Plaintiff and his family would have likely rejected any such measure, fearing the

stigma that might attach to what Plaintiff feared was the scarlet letter he alone

had to bear. As Hawthorne himself admonished long before Plaintiff set out on his cross-country journey, "Wouldst thou have me to believe, O wise and pious friend, that a false show can be better—can be more for God's glory, or man's welfare—than God's own truth? Trust me, such men deceive themselves."[396]

Judge Arbuckle's report and recommendation is adopted in part and rejected in part in consistent with this opinion. An appropriate Order follows.

BY THE COURT:


s/ Matthew W. Brann
Matthew W. Brann
United States District Judge

---

[396]  Nathaniel Hawthorne, The Scarlet Letter, Chapter 10 (1850).